**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISON**

| | | |
|---|---|---|
| DWIGHT WALKER, | ) | CASE NO. 1:21-CV-01474-JG |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     Introduction

Plaintiff, Dwight Walker, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Walker's Statement of Errors and AFFIRM the Commissioner's decision.

## II.     Procedural History

On November 13, 2019, Walker filed an application for DIB, alleging a disability onset date of April 7, 2019. (ECF No. 7, PageID #: 100). The application was denied initially and upon reconsideration, and Walker requested a hearing before an administrative law judge ("ALJ"). (ECF No. 7, PageID #: 129). On July 16, 2020, an ALJ held a hearing, during which Walker, represented by counsel, and an impartial vocational expert testified. (ECF No. 7, PageID #: 72). On November 30, 2020, the ALJ issued a written decision finding Claimant was not disabled. (ECF No. 7, PageID

1

#: 43). The ALJ's decision became final on June 1, 2021, when the Appeals Council declined further review. (ECF No. 7, PageID #: 37).

On July 29, 2021, Walker filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 9, 11, 12). Walker asserts the following assignments of error:

> (1) The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers. As such, the decision in this case by an ALJ who derived her authority from Andrew Saul was constitutionally defective.

> (2) The ALJ committed harmful error when she failed to find that Walker satisfied the criteria of a Listing at Step Three of the Sequential Evaluation or in the alternative that the combination of his symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

> (3) The ALJ erred as her evaluation of Walker's symptoms was in violation of Social Security Ruling 16-3p.

(ECF No. 9 at 1).

## III.    Background

### A.    Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant testified that he is single and lives with his sister. He last worked on April 7 or April 8, 2019. He currently weighed approximately 320 pounds and is left hand dominant. The highest grade he completed was the ninth grade. He was not successful in obtaining his GED. He suffered an injury to his left eye in April of 2019. He sees only shadows with his left eye. He does not see color; he has approximately seven to eight percent of his vision left. In his left eye, he is able to see his hand up close, if he moves it. He cannot see things that are one foot away. He has keratomas in both eyes, and his vision is blurred and he must wear a special contact lens. Per the claimant, he alleged that his right eye vision is progressively worsening. He awoke one day the week before and he had no vision in his right eye. He is to have a cornea transplant in his right eye in the next few days. Before the recent problems with his right eye, he

could see nothing but shadows with his left eye. His right eye was functioning at twenty-five to thirty percent. He spent his days sitting on the couch and watching television, using his right eye. He last drove four years ago because he cannot see. He continued to work, but was demoted twice because of his vision problems. He used Lyft to travel to work. He was hit in the left eye when he tried to stop an altercation. He is still trying to lose weight. He has a CPAP machine, but has not used it in a week. The corneal transplant in his left eye was not beneficial at all. At first, he was able to see a little bit, but the improvement lasted for only one to two weeks. Although it was initially helpful, he does not sleep through the night, despite his CPAP. He is fatigued and takes naps. His hernia bulges and is uncomfortable. He is able to lift twentyfive to thirty pounds. His doctor did not give the claimant a weight limit but told him not to lift too much and to stay off his feet. His vision is blurred and he cannot see the features of his hand when he holds it in front of his face.

(ECF No. 7, PageID #: 51).

## B.      Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

The record shows that the claimant presented to the emergency department on April 7, 2019 with left eye pain and reported that he had been punched in his left eye, that his hard contact lens broke in his eye, and that he had removed the broken lens (Exs. 2F/43-44, 5F/90). He reported decreased left eye vision but was able to see light (Ex. 2F/44). Findings on examination included lost fullness of the left eye globe; scleral injection on the left; laceration of his cornea; and misshapen and non-reactive pupil (Ex. 2F/44). . . . CT studies of the orbits revealed contour abnormality of the left eye globe with asymmetrically decreased ocular volume concerning for globe rupture; medial orbital wall fracture; and left facial soft tissue swelling (Exs. 1F/128-129, 2F/45, 66, 5F/129-131). The impression was ruptured globe of the left eye for which he was admitted (Ex. 2F/45). The claimant underwent surgical repair of the ruptured globe (Exs. 1F/80, 2F/47-48, 5F/97). Ophthalmology records of April 29, 2019 show visual acuity in Snellen testing of 20/80 on the right and counting fingers, one foot, on the left (Ex. 1F/66).

Eye consultation records note a history of keratoconus for which the claimant wore scleral lenses and that he was otherwise healthy (Ex. 2F/45). Notably, his right eye was at baseline and asymptomatic (Ex. 2F/46). Findings on examination included unreactive left eye

with iris prolapse through the wound; however, his right eye visual fields were full to confrontation (Ex. 2F/47).

On May 2, 2019, the claimant presented for a pre-surgical evaluation for left detached retina repair surgery (Ex. 2F/34). . . . Operative records of May 3, 2019 show the claimant underwent repair of a scleral buckle, pars plana vitrectomy, lensectomy endolaser, 14% C3F8 gas left eye and the postoperative diagnoses of rhegmatogenous retinal detachment left, retained lens fragments left eye, and iris trauma left eye (Exs. 1F/60, 2F/33-34). Ophthalmology records of May 4, 2019 show the claimant presented in follow up of a ruptured globe on the left eye (Exs. 1F/56, 2F/28). With regard to the left eye medial orbital fracture, the clinician noted there was radiographic evidence of a fracture without EOM entrapment (Ex. 2F/29). Ophthalmology records of May 13, 2019 show visual acuity with Snellen testing was 20/80 and 20/40 on the right and was to hand motion on the left (Ex. 1F/52). On June 3, 2019, ophthalmology records show the claimant was two months status post ruptured globe repair on the left and that he reported that visual acuity was stable (Ex. 1F/47). He said that his left eye was irritated and that symptoms worsened as the day went on; that it constantly watered; and that he saw flashes (Ex. 1F/47). However, his visual acuity on the right, corrected with contacts, was 20/30-2; and on the left was to hand motion (Ex. 1F/48).

The claimant reported on July 1, 2019 that he continued with pain in the left eye, with touch, and that he saw things floating in his left eye, at times (Ex. 1F/42). On examination, vision in his right eye was 20/60-1 and 20/40-2, corrected with contacts; in his left eye, vision to hand motion was noted (Ex. 1F/43). Slit lamp examination showed steep central right cornea with apical scarring; and, on the left eye, superior gas bubbles, iris present with IK strands to the central scar, aphakic lens, and avitric vitreous (Ex. 1F/44). The claimant was referred to corneal specialists for evaluation for a corneal transplant and was then to be evaluated by retinal specialists (Exs. 1F/45, 5F/68). On July 22, 2019, findings on examination included significant steepening of the right eye but that BCVA (best corrected visual acuity) was 20/40 with RGP (rigid gas permeable lens); the claimant denied problems with the lens (Ex. 2F/23). On examination, his uncorrected visual acuity on the right was 20/200; and on the left was CF (counting fingers) face (Ex. 1F/38). The clinician noted that the claimant was not having problems with his contact lens (Ex. 1F/39). He was to be evaluated for a corneal transplant due to central scarring after his retina healed (Exs. 1F/39, 2F/23).

4

Ophthalmology records of August 19, 2019 state the claimant's retina was attached and stable and that he was referred for evaluation regarding a possible corneal transplant (Exs. 1F/33, 2F/23). The claimant reported that visual acuity was stable and he denied flashes or floaters (Ex 1F/34). On examination, visual acuity in the right eye was 20/50-2, and, in the left eye was CF (counting fingers) at face (Ex. 1F/35). His eye pressure was fifteen on the right and twenty-two on the left (Ex. 1F/35). Slit lamp examination showed steep central, apical scarring and central thinning of the cornea on the right; and aphakic lens on the left (Ex. 1F/35). Telephone records of September 27, 2019 regarding paperwork for workplace accommodation note the claimant reported that the desired return to work date was November 18, 2019 (Ex. 2F/21).

The claimant presented to ophthalmology on October 2, 2019 for evaluation regarding a left corneal transplant (Exs. 1F/28, 2F/20). He was status post repair of a ruptured globe of the left eye on April 7, 2019 due to corneal laceration by broken scleral lens (Ex. 2F/20). The clinician noted that the retina was flat and vessels were healthy (Ex. 2F/20). The claimant underwent a penetrating keratoplasty on the left eye (Exs. 1F/21, 2F/14). . . .

Optometry visit records of October 22, 2019 show the claimant presented regarding a replacement contact lens for his right eye (Ex. 1F/13). On eye examination, Snellen testing revealed visual acuity of 20/60-1 and 20/40 on the right eye (Ex. 1F/14). The claimant presented on October 23, 2019 in follow up of a penetrating keratoplasty and reported random pain, blurred vision, and redness in the left eye (Ex. 1F/10). He reported a block in his central vision at the left eye (Ex. 1F/11).

Dr. Andrew Zheng noted on November 6, 2019 that the claimant had a history of a ruptured globe that was stable (Exs. 1F/7, 2F/4, 5F/41). He was doing well with regard to a left corneal transplant on October 15, 2019 (Ex. 2F/4). The claimant reported that his left eye vision frequently fluctuated, and he reported some irritation and throbbing, as well as a black line in his vision (Ex. 1F/5). Findings on examination of the left eye included traumatic iris and aphakic lens (Ex. 1F/6). . . . Telephone records note the claimant requested a replacement hard contact lens for his right eye on November 24, 2019; he said that he was unable to see without it (Ex. 3F/17).

Progress records of December 3, 2019 show the claimant reported that his left eye vision was seventy percent of normal, and that prescribed steroid drops provided complete relief of symptoms of blurring and itching (Exs. 3F/12, 5F/32, 35). He said that his right

eye was unchanged (Ex. 3F/12). He said that he was concerned about his ability to return to his work as a heavy equipment operator; a post-surgical assessment was to be completed by ophthalmology on December 6, 2019 and ophthalmology was to discuss restrictions for returning to work (Exs. 3F/12, 5F/35). Findings on examination included red sclera consistent with history of corneal transplant; lungs clear to auscultation; regular heart rate and rhythm; non-tender abdomen with hernia; and normal extremities without edema (Ex. 3F/13). Assessments included ventral hernia without obstruction or gangrene (Ex. 3F/14). The claimant requested a referral to surgery for reduction of his abdominal hernia (Ex. 3F/14). Dr. Jamil Khouri noted the claimant was doing well after his corneal transplant and that his vision was improved but was not back to normal (Ex. 5F/39). . . .

Ophthalmology records of December 6, 2019 note the claimant was doing well following his left corneal transplant and that observation with regard to his aphakia and traumatic iris would be continued (Exs. 3F/11, 5F/31). The claimant reported that his left eye felt fine, and Dr. Steinemann noted that his sutures were intact and that his left cornea was clear (Ex. 3F/11). Dr. Steinemann further noted the claimant needed to replace his lost right eye contact and then was to return to work (Ex. 3F/11). On December 18, 2019, Cleveland Clinic records show the claimant was fitted with a scleral lens (Ex. 4F/5). Corneal topography atlas studies of both eyes on December 19, 2019 show stable bilateral keratoconus and cornea replaced by transplant (Ex. 4F/5).

The claimant presented for evaluation of a ventral hernia on December 30, 2019. 5F/23, 3F/5. He had no obstructive symptoms (Ex. 3F/5). Findings on examination included lungs clear to auscultation; regular heart rate and rhythm; palpable bulge at the abdomen; normal gait and station; no edema; and normal motor, strength, and sensation (Ex. 3F/6). CT studies were planned, and the clinician noted the claimant would need to lose weight prior to hernia repair and he was referred for weight management (Ex. 3F/6).

On January 2, 2020, ophthalmology records show the claimant had undergone a left corneal transplant on October 15, 2019 and that the graft was clear (Ex. 3F/4). Findings on examination included scleral lens in the right eye; apical thinning and scarring; left eye aphakia; iris stumps; acceptable IOP (intraocular pressure); intact sutures; and no signs of rejection (Exs. 1F/22, 3F/4). The clinician noted that visual potential for the left eye was poor (Ex. 3F/4).

Dr. Ronald Magliola noted on February 6, 2020 that the claimant

was not working but the loss of work was not related to weight issues (Ex. 5F/18). Findings on examination included healthy appearance; good air exchange without rales, wheezing, or rhonchi; regular heart rate and rhythm with normal S1 and S2 sounds; non-tender abdomen without costovertebral tenderness; nontender back with full range of motion; bilateral knee crepitus; and one plus lower extremity edema (Ex. 5F/19). Plan notes show a goal of a five to fifteen percent weight loss (Ex. 5F/21). . . .

Cleveland Clinic records of February 17, 2020 show the claimant had keratoconus of both eyes and that he was status post corneal transplant of the left eye (Ex. 4F/3). An improvement of vision with an adjustment was noted; a new lens was to be trialed (Ex 4F/3). . . .

Pulmonary office records on March 18, 2020 show an auto PAP was ordered for the claimant, who presented for surgical clearance (Ex. 5F/12). On March 19, 2020, progress records note the claimant reported exercising through yardwork and walking to the store (Ex. 5F/8).

Bariatric surgical consultation records of a televisit on April 10, 2020 show the claimant had been previously seen in person regarding a ventral hernia and that weight loss prior to surgical repair of the hernia had been discussed (Ex. 6F/2). The claimant denied bowel symptoms, nausea, emesis, and significant pain (Ex. 6F/2). Abdomen and pelvis CT studies on January 17, 2020 revealed a fat-containing ventral hernia (Exs. 3F/20, 5F/115-117, 6F/2).

(ECF No. 7, PageID #: 51–55).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. The claimant has the following severe impairments: left eye impairments status post surgery; keratoconus of both eyes; ventral hernia; and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is able to

7

occasionally stoop, kneel, crouch, crawl, and climb of ramps and stairs; never climb ladders, ropes, or scaffolds; have no exposure to hazards, such as unprotected heights or dangerous machinery; no requirements for driving. The individual cannot perform job duties that require precise depth perception [e.g. threading a needle]; and can only occasionally perform job tasks that require Near Acuity (as defined in SCO; that is "clarity of vision at 20 inches or less").

(ECF No. 7, PageID #: 48–50).

## V.    Law & Analysis

### A.    Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B.    Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in

8

determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

## C.      Discussion

Walker raises three issues on appeal. First, he asserts that the appointment of the Commissioner of the Social Security Administration violated the separation of powers. Second, Walker argues that the ALJ erred by finding that Walker did not meet Listing 2.02—Loss of Central Visual Acuity—or that the combination of his symptoms precluded him from engaging in substantial gainful activity. Finally, Walker suggests that the ALJ violated SSR 16-3p—Evaluation of Symptoms in Disability Claims—in considering his symptoms.

### 1.  Walker lacks Standing to Challenge the ALJ's Decision Based on Alleged Separation of Powers by the Commissioner

Walker asserts that "[b]ased on the fact that Andrew Saul's tenure as Commissioner of SSA

was unconstitutional, and he was Commissioner at the time of the ALJ and Appeals Council decisions, this matter should be remanded for a *de novo* hearing." (ECF No. 9 at 10). Walker argues that because Acting Commissioner Saul was unconstitutionally appointed, the authority he delegated to the ALJ to hear and ultimately determine Walker's application for disability benefits was also unconstitutional. In support of this argument, Walker cites to *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) for the proposition that Saul's appointment under 42 U.S.C. § 902(a) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause. The Commissioner does not dispute that the relevant removal provision "violates the separation of powers to the extent it is construed as limiting the President's authority to remove the Commissioner without cause." (ECF No. 11-1 at 8 (citations omitted)). Instead, the Commissioner argues that Walker is not entitled to relief because "even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction actually caused him harm." (ECF No. 11-1 at 8–9 (citing *Collins v. Yellen*, 141 S. Ct. 1761, 1787–89 (2021)). Specifically, the Commissioner argues that Walker cannot show harm to support his claim for relief because the ALJ's appointment was ratified by an Acting Commissioner who was not subject to the challenged removal restriction, and because Walker cannot show that the removal restriction caused the denial of his benefits.

Before the Court may address the substance of this argument, the Court must first determine whether Walker has standing to challenge the alleged unlawful removal provision. The Commissioner does not specifically contest Walker's standing. However, even if the parties do not challenge standing, "federal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*." *Answers in Genesis of Ky., Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir. 2009) (citations omitted).

To establish Article III standing, a plaintiff must show that he or she has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations omitted) (citations and internal quotation marks omitted). "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Collins*, 141 S. Ct. at 1779 (internal quotation marks and citation omitted).

First, Walker argues that he has standing because the commissioner "failed to proffer any argument" that he lacked standing. (ECF No. 12 at 2). However, "[a]s a jurisdictional requirement, standing . . . cannot be waived or forfeited." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) (emphasis added). Next, Walker argues that he has standing as a "disability claimant who [] received an unfavorable decision during the administrative process[.]" (ECF No. 12 at 2–3 (citing *Brinkman v. Kijakazi*, 2021 WL 4462897, at *2 (D. Nev. Sept. 9, 2021) and *Sylvia v. Kijakazi*, 2021 WL 4692293, at *3 (N.D. Tex. Sept. 13, 2021))). Contrary to Walker's argument, in *Brinkman*, the court found that the plaintiff lacked standing to bring the constitutional challenge by failing to "allege facts that support a finding that her injury, the denial of disability benefits, can be or is traced to the conduct of the SSA Commissioner." 2021 WL 4462897, at *2. Citing to *Collins* and *Seila Law*, the court explained: "Because Plaintiff offers nothing that traces the decision by the ALJ in her case to any alleged injurious conduct by the SSA Commissioner, she has not demonstrated traceability and her constitutional violation claim fails for lack of standing." *Id*. Thus, *Brinkman* does not support Walker's argument.

In *Sylvia*, however, the court found that "[p]laintiff's separation-of-powers claim is both traceable and redressable such that she has standing to pursue it." *Sylvia A. v. Kijakazi*, No. 5:21-

CV-076-M-BQ, 2021 WL 4692293, at *4 (N.D. Tex. Sept. 13, 2021), *report and recommendation adopted,* No. 5:21-CV-076-M-BQ, 2021 WL 4622528 (N.D. Tex. Oct. 7, 2021). The court explained that the traceability requirement was met "[b]ecause the ALJ derives authority directly from the Commissioner, and the ALJ's disability determination becomes the Commissioner's final decision." 2021 WL 4692293, at *3. In so finding, the court observed that "'[i]f the removal protections afforded the Commissioner violate the constitutional requirement of separation of powers, the Commissioner has no authority to delegate.'" *Id.* (alteration in original) (citations omitted). *Sylvia*'s conclusion, however, directly conflicts with the Supreme Court's conclusion in *Collins* that the unlawfulness of a similar removal provision did not strip the relevant executive officer "of the power to undertake the other responsibilities of his office." 141 S. Ct. at 1788 n.23 (citing *Seila Law*, 140 S. Ct. at 2207–11). Accordingly, this Court does not find *Sylvia* to be persuasive. *See Rives v. Comm'r of Soc. Sec.*, No. 1:20-CV-02549, 2022 WL 1076216, at *22 (N.D. Ohio Feb. 4, 2022), *report and recommendation adopted*, No. 1:20CV2549, 2022 WL 681273 (N.D. Ohio Mar. 8, 2022); *Reese v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-2385, 2022 WL 1090538, at *17 (N.D. Ohio Jan. 31, 2022), *report and recommendation adopted*, No. 5:20CV2385, 2022 WL 831122 (N.D. Ohio Mar. 21, 2022).

The mere receipt of an unfavorable decision is not sufficient to establish harm traceable to the alleged unlawful conduct.[1] The majority of courts having examined this issue have concluded that a party similarly situated to Claimant lacks standing by failing to allege facts supporting that

---

[1] Walker also asserts that President Biden terminated Mr. Saul and noted that Mr. Saul "had undermined and politicized Social Security disability benefits." (ECF No. 9 at 9). Because of this, Walker argues that "it can be inferred that the policy adjudication framework and processes established by Mr. Saul was the primary and lead reason for President Biden's dissatisfaction." (ECF No. 9 at 9). However, again, Walker does not explain how this affected his specific case. Walker was required to trace his unfavorable decision to the unlawful conduct, and he failed to do so. This argument is, therefore, without merit.

the denial of disability payments could be traced to the conduct of the Commissioner of the Social Security Administration. *See Walker v. Comm'r of Soc. Sec. Admin.*, No. 4:20-CV-02506-CEH, 2022 WL 1266135, at *6 (N.D. Ohio Apr. 28, 2022) (collecting cases).

Therefore, Walker has failed to show compensable harm connected to the unconstitutional removal provision. Walker asserts that "based on the fact that Andrew Saul's tenure as Commissioner of SSA was unconstitutional, and he was Commissioner at the time of the ALJ and Appeals Council decisions, this matter should be remanded for a de novo hearing." (ECF No. 16 at 9). However, "the fact that the removal restriction in § 902(a)(3) is unconstitutional does not entitle [Walker] to a remand for a new hearing and decision in his case." *Klapp v. Comm'r of Soc. Sec. Admin*., No. 5:20-CV-02850-JDG, 2022 WL 310228, at *15 (N.D. Ohio Feb. 2, 2022). As the Supreme Court in *Collins* explained, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S. Ct. at 1788.

Walker also asserts that "[t]he ALJ in this matter decided this case based on regulations promulgated by the Commissioner when he had no authority to issue the same. . . . This means that a presumptively inaccurate legal standard was utilized by both the ALJ and the Appeals Council to adjudicate this claim." (ECF No. 9 at 7–8). However, Walker fails to explain which regulations the Commissioner promulgated that the ALJ used to decide his case. Moreover, Walker's argument that the Commissioner had no authority to carry out the functions of office because the removal restriction was unconstitutional was rejected by the Supreme Court in *Collins*. 141 S. Ct. at 1788.

In his reply brief, Walker asserts that the Commissioner "modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015)." (ECF No. 12 at

6). However, POMS DI 34121.013 and 34121.015 became effective in April 2021 and Walker fails to explain how the changes impacted his 2019 application or 2020 hearing and decision. Walker also asserts that "while Mr. Saul was Commissioner, he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)." (ECF No. 12 at 6). However, HALLEX I-2-3-20, sets forth ways in which the Agency notifies claimants that it received their notice of hearing forms; it does not modify the way the ALJs write their decisions. *See* Social Security HALLEX I-2-3-20, Acknowledgment of Notice of Hearing, https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 5/17/2022). Nonetheless, Walker has not argued how those changes made it more or less likely that his application would be denied. Finally, Walker argues that he did not receive "constitutionally valid" decisions by the ALJ and the Appeals Council. Walker fails to explain the basis for these arguments. To the extent Walker again asserts a challenge to Mr. Saul's delegation authority, this challenge fails under *Collins*, as discussed above.[2]

None of Walker's assertions describe the type of compensable harm stemming from an unconstitutional removal provision that was described in *Collins*. Walker does not state that when his application was pending the President was unable to remove Saul from office or believed that he was unable to do so. *Collins*, 141 S. Ct. at 1789. Walker does not describe how he was harmed at the time of the ALJ's decision in November 2020 or when the Appeals Council denied his request for review in June 2021. Without a harm traceable to an unlawful action by the Commissioner, Walker does not have standing to challenge the constitutionality of § 902(a)(3). *See Rives*, 2022 WL 1076216, at *22–23.

---

[2] To the extent his argument could be viewed as an Appointments Clause challenge, Walker emphasized in his reply brief that he is not raising an Appointments Clause challenge. (ECF No. 12 at 7).

14

Accordingly, Walker's constitutional challenge fails because he "has not described compensable harm due to the unconstitutional removal provision in § 902(a)(3) under which Saul served as Social Security Commissioner." *Lynch v. Comm'r of Soc. Sec.*, No. 1:21CV0556-JDG, 2022 WL 614777, at *17 (N.D. Ohio Mar. 2, 2022); *Miley*, 2021 WL 6064754, at *1 ("[Plaintiff] lacks standing to contest the constitutionality of the ALJ's decision based on the president's removal authority.").

### 2. The ALJ's Decision is Supported by Substantial Evidence

In his second assignment of error, Walker makes four sub-arguments. First, he argues that the ALJ erred in concluding that he did not Meet Listing 2.02. Second, he suggests that the ALJ erred by not finding that the combination of his impairments precluded him from engaging in substantial gainful activity. Third, he asserts that the ALJ failed to properly evaluate his obesity. Finally, he alleges that the RFC inappropriately allowed for occasional near acuity. The Court will take each one in turn.

### a. The ALJ did Not Err in Concluding that Walker Did Not Meet Listing 2.02

Walker argues that the ALJ erred in failing to find that Walker satisfied the criteria of Listing 2.02. To meet a listing, the claimant "must satisfy all of the [listing's] criteria." *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *3 (6th Cir. Aug. 10, 2020). The claimant "bears the burden of showing that an impairment meets or equals a listed impairment." *Id.* As long as the ALJ's finding is supported by "substantial evidence, based on the record as a whole," the Court will defer to the ALJ's finding, "[e]ven if the record could support an opposite conclusion." *Id.* at *4.

To meet Listing 2.02 for loss of central visual acuity, a claimant must demonstrate that the "[r]emaining vision in the better eye after best correction is 20/200 or less." 20 C.F.R. § 404

Subpart P, App. 1. In concluding that Walker did not meet this Listing, the ALJ reasoned:

> the remaining vision in the claimant's better eye after best correction is greater than Listing requirement 20/200 (Ex. 1F/65). For example, ophthalmology records in April of 2019 show visual acuity in Snellen testing of 20/80 on the right (Ex. 1F/66) or in July 2019 his best corrected visual acuity in the right eye was 20/40 (Ex. 1F/39).

(ECF No. 7, PageID #: 50). Indeed, Walker does not point to any evidence to the contrary. Walker instead cites to evidence regarding his damaged eye and a medical record that demonstrates that his better eye's vision was 20/200 without correction. However, Listing 2.02 explicitly requires that the better eye's vision be worse than 20/200 with correction. The medical record consistently demonstrates that Walker's right eye's vision was greater than 20/200.[3] Thus, the ALJ properly considered Listing 2.02 and substantial evidence supports his conclusion that Walker did not meet it.

**b.    The ALJ did Not Err in Concluding that the Combination of Walker's Impairments did not Preclude Walker from Engaging in Substantial Gainful Activity**

Walker alternatively argues that the ALJ erred by failing to consider the combined effect of all of Walker's limitations. Walker asserts that in addition to the loss of vision in his left eye, he had keratoma in his right eye which caused blurred vision. He also suffered from sleep apnea, a ventral hernia, and obesity. The combination of these impairments, Walker suggests, established

---

[3] Walker attempts to argue that even if his better eye's vision was greater than 20/200, he was in need of a corneal transplant in his right eye due to keratoconus which resulted in blurry vision. (ECF No. 9 at 11). However, Walker provides no explanation as to how this would change the ALJ's analysis. Walker's right eye's vision remained between 20/80 and 20/40 despite this diagnosis. Because Walker failed to provide any explanation regarding this argument, it is deemed waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (alteration in original) (citations omitted)).

disability. He asserts that it was thus harmful error to not consider their combination. The Commissioner responds that this argument is without merit as the ALJ considered each of Walker's impairments individually and in combination.

The Social Security Act requires an ALJ to "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. § 404.1523(c). An ALJ's "analysis of a claimant's combined impairments is sufficient where the judge referred to a 'combination of impairments' in deciding the claimant did not meet the listings and all of the claimant's impairments were discussed individually in the decision." *Austin v. Comm'r of Soc. Sec.*, 714 F. App'x 569, 575 (6th Cir. 2018) (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)). Here, that is exactly what the ALJ did.

The ALJ considered Walker's sleep apnea and found that it was not severe because studies showed that it was controlled with use of a CPAP. (ECF No. 7, PageID #: 49). As discussed above, the ALJ considered the impairments involved with both eyes and concluded that Walker did not meet a listing. (ECF No. 7, PageID #: 50). The ALJ discussed Walker's ventral hernia but stated that it did not meet a listing "alone or in combination." (ECF No. 7, PageID #: 50). The ALJ also considered Claimant's obesity but concluded that there was no indication that claimant's obesity, "alone or in combination with any other impairment, has given rise to a condition of listing-level severity." (ECF No. 7, PageID #: 50). Ultimately, the ALJ concluded that "[c]onsidered individually and in combination, the claimant's impairments did not meet or medically equal any Listings." (ECF No. 7, PageID #: 50). This meets the two-part requirement noted above as the ALJ referred to a "combination of impairments" in deciding the Walker did not meet the listings and all of the Walker's impairments were discussed individually in the decision. The Court, therefore,

concludes that the ALJ sufficiently considered the combination of Walker's impairments. Walker's argument to the contrary is without merit.[4]

### c. The ALJ Properly Considered Walker's Obesity

Walker next argues that the ALJ failed to properly evaluate Walker's obesity "beyond a perfunctory mention of the relevant Ruling." (ECF No. 9 at 13). SSR 19-2p "provides guidance on how [SSA] establish[es] that a person has a medically determinable impairment of obesity" and how an ALJ should "evaluate obesity in disability claims." 84 Fed. Reg. 22924 (May 20, 2019). In relevant part, the regulation states that the RFC should account for "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id.* The claimant has "the burden of showing specifically how [his] obesity, in combination with other impairments, limited [his] ability to a degree inconsistent with the ALJ's RFC determination." *Foss v. Comm'r of Soc. Sec.*, No. 1:16CV1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017) (citations omitted), *report and recommendation adopted* by 2017 WL 2908857 (N.D. Ohio July 7, 2017).

After the ALJ concluded that Walker's obesity was a severe impairment at Step Two, the ALJ considered his obesity at Step Three and Four. At Step Three, the ALJ stated:

> The claimant's body mass index (BMI) is 45.7. Per Social Security Ruling 19-2p, a BMI of 30 or more is considered obese. Obesity is not a listed impairment; however, the functional limitations caused

---

[4] Walker relies on *Lashen v. Sec'y of Health & Human Servs.*, No. 92-3936, 1993 WL 358538 (6th Cir. Sept. 15, 1993) where the Sixth Circuit reversed a decision and awarded benefits to a "claimant [who] was blind in the left eye, had frequent eye irritations, burning, redness, and infections with sympathetic effect on the right eye." (ECF No. 9 at 11). However, this is a mischaracterization of the opinion. There, in addition to issues in both eyes, the claimant was unable to bend, unable to tolerate smoke, fumes, dust, wind, or allergens, he was unable to squat, crawl, or climb, or use his feet for pushing or pulling. *Lashen*, 1993 WL 358538, at *7. He could not lift with his right hand or arm (despite being right handed) and had other limitations. *Id.* This is clearly a different scenario than the one before the Court today. Thus, this case does not support Walker's argument.

18

by obesity, alone or in combination with another impairment(s), may medically equal a listing. Obesity is often associated with musculoskeletal, respiratory, cardiovascular, and endocrine disorders. Consequently, I evaluated the claimant's obesity considering the criterial of Listings 1.00, 3.00, 4.00, and 9.00 respectively. (See Social Security Ruling 19-2p.) I also note that per SSR 19-2p obesity increases the risk of developing mental impairments, cancer, etc., which were also evaluated. However, there is no indication that the claimant's obesity, alone or in combination with any other impairment, has given rise to a condition of listing-level severity. In addition, no expert designated by the Commissioner has offered an opinion that any of the claimant's impairments equal a section of the listed impairments.

(ECF No. 7, PageID #: 50). Then at Step Four, the ALJ again considered Walker's obesity, stating:

With regard to the claimant's obesity, I have given consideration to Social Security Ruling 19- 2p, which instructs adjudicators to consider the effects of obesity not only under the listings, but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity. When obesity is identified as a medically determinable impairment, consideration will be given to any functional limitations resulting from the obesity in the residual functional capacity assessment in addition to any limitations resulting from any other physical or mental impairment identified. Here, the claimant is five feet eleven inches and weighed 320 pounds (Ex. 2F/69). Based on these measurements, the claimant's body mass index (BMI) was 44.63, which is obese. The medical record does not evidence that any of the claimant's treating providers have listed any specific functional limitations due to obesity. However, when considering the combination of the claimant's obesity and his other impairments, the reduction to the light exertional level above is appropriate.

(ECF No. 7, PageID #: 55).

The ALJ's discussion of Walker's obesity and his recognition that none of the claimant's treating providers listed a specific functional limitation due to obesity contradicts Walker's argument that the ALJ's discussion of his obesity was perfunctory. Walker argues that the ALJ's statement about his treating providers is incorrect because it was recommended that Walker lose weight at one point and treating sources indicate that obesity was affecting his sleep apnea,

prediabetes, joint pain, and ventral hernia. However, this does not contradict the ALJ's statement. The ALJ recognized that Walker's obesity affected his other impairments and limited him to the light exertional level. Walker did not point to any medical record that demonstrated that his obesity caused any specific functional limitation. In fact, as the ALJ pointed out, Dr. Magliola noted that Walker was not working but the loss of work was not related to weight issues. (ECF No. 7, PageID #: 504). The ALJ's decision was supported by substantial evidence and Walker's argument is thus without merit.

### d.      The ALJ's RFC was Supported by Substantial Evidence

Walker additionally argues that the ALJ's RFC inappropriately allowed for occasional near acuity. He alleges that this restriction was for both eyes and failed to account for Walker's lack of vision in his left eye. However, the Court fails to understand how this affects the ALJ's RFC. It is undisputed that with correction Walker can see out of his right eye. Walker points to no regulation or case that suggests that an RFC is incorrect because it allows for near acuity where the claimant is blind in one eye. In fact, the Court finds other cases affirming an RFC that did not include explicit limitations about the blind eye. *See Damron v. Comm'r of Soc. Sec.*, No. 2:17-CV-044, 2017 WL 4856370, at *4 (S.D. Ohio Oct. 27, 2017) (discussing an RFC that did not include a specific limitation for the claimant's blind eye), *report and recommendation adopted,* No. 2:17-CV-44, 2018 WL 1418189 (S.D. Ohio Mar. 21, 2018); *Segers v. Comm'r of Soc. Sec.*, No. 5:16-CV-2017, 2017 WL 9478425, at *5 (N.D. Ohio June 19, 2017) (same), *report and recommendation adopted sub nom. Segers v. Berryhill*, No. 5:16-CV-2017, 2017 WL 4129117 (N.D. Ohio Sept. 19, 2017). With correction, Walker can see out of his right eye and his doctors stated that he could return to work. (ECF No. 7, PageID #: 461). This is substantial evidence for the ALJ's near acuity finding. Moreover, the ALJ's RFC accommodates Walker's left eye by

avoiding exposure to hazards, driving, and jobs that require depth perception. Walker does not point to a limitation from a medical opinion that was not included in his RFC or suggest a different limitation. *See Segers*, 2017 WL 9478425, at *10. Thus, Walker's argument is without merit.

Additionally, Walker argues that "[f]ailing to inquire [with the VE] as to whether a person limited to only occasional near acuity in one eye along with no precise depth perception could perform the jobs identified was in error." Walker is mistaken. Indeed, "[t]he testimony of a vocational expert may be substantial evidence to support a decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant." *Thompson v. Comm'r of Soc. Sec.*, No. 3:11-CV-493-H, 2012 WL 2089709, at *12 (W.D. Ky. May 7, 2012) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512–513 (6th Cir. 2010)), *report and recommendation adopted*, No. 3:11-CV-493-H, 2012 WL 2089708 (W.D. Ky. June 8, 2012). However, the hypothetical does not need to include a list of the claimant's medical conditions or incorporate limitations asserted by the claimant that are properly rejected by the ALJ. *See id.* Here, the ALJ posed a hypothetical consistent with the RFC. As discussed above, the Court finds no reason to disturb the ALJ's RFC. Proposing a hypothetical consistent with it was therefore proper. Moreover, Walker similarly failed to ask the VE whether a person limited to only occasional near acuity in one eye along with no precise depth perception could perform the jobs identified. Thus, this argument is forfeited. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 636 (6th Cir. 2012) (concluding that the claimant forfeited her argument that the ALJ's hypothetical was deficient where she failed to probe the deficiency at the hearing).

### 3. The ALJ did Not Err in Evaluating Walker's Symptoms

Finally, Walker argues that the ALJ erred in her evaluation of Walker's symptoms in violation of SSR 16-3p. In determining whether a claimant is disabled, the ALJ considers all of

the claimant's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective evidence in the record. SSR 16-3P, 2017 WL 5180304, at *2. A claimant's subjective complaints "can support a claim for disability[] if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). An ALJ, however, "is not required to accept a claimant's subjective complaints." *Id.* at 476 (citations omitted). "[I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, [the ALJ] will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner." SSR 16-3P, 2017 WL 5180304, at *8. The ALJ "must clearly state [her] reasons" for discounting or rejecting a claimant's subjective complaints. *Harper v. Comm'r of Soc. Sec.*, No. 1:20-CV-1304, 2021 WL 2383833, at *11 (N.D. Ohio May 25, 2021) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)), *report and recommendation adopted*, No. 1:20-CV-1304, 2021 WL 2381906 (N.D. Ohio June 10, 2021).

Walker argues that "the ALJ failed to articulate any supportable rationale beyond [a] boilerplate paragraph" for discrediting the claimant's testimony. (ECF No. 9, PageID #: 667). The Commissioner responds that the ALJ considered Walker's subjective complaints and rejected them, "highlight[ing] the lack of objective support for [Walker's] allegations." (ECF No. 11-1 at 27). As an initial matter, the Court points out that the ALJ is only required to explain his reasoning for *rejecting* a claimant's subjective complaints. A review of Walker's argument and his hearing testimony demonstrates that the ALJ accepted the majority of his subjective complaints. For example, in arguing that the ALJ failed to address his symptoms in his brief, Walker cites to the

fact that that he cannot see items that were more than a foot away with his left eye. However, the ALJ did not disagree with that statement and cited objective evidence consistent with it. (ECF No. 7, PageID #: 51–54). Despite accepting this testimony, the ALJ concluded that near blindness in that eye alone simply was not sufficient to establish disability. Walker additionally points to his statement that he could not drive, but the ALJ included a limitation in his RFC that prohibited driving requirements. (ECF No. 7, PageID #: 50). The ALJ similarly accepted all of Walker's statements regarding his height and weight. (ECF No. 7, PageID #: 55). Thus, the ALJ did not need to explain the weight of the above statements as he did not reject them.

The only statements regarding Walker's subjective complaints that the ALJ appears to have rejected are the statements regarding Walker's right eye and some issues with fatigue. Regarding his right eye, Walker testified that he was having problems with vision, causing him blindness. Contrary to Walker's argument, the ALJ explained why he failed to accept this testimony. The ALJ reasoned:

> While the claimant testified that he recently woke up with worsening vision or no vision in his right eye and was to undergo surgery soon, I note that despite allowing additional time to submit evidence to support this worsening that no such evidence was submitted. Rather, the only post hearing evidence submitted related to bariatric consult surgery (Ex. 6F). No additional time to submit the evidence pertaining to his worsening right eye vision was requested. Based on the evidence of record, I adopted appropriate visual restrictions as part of the claimant's residual functional capacity to address his left eye impairment. Given the evidence regarding his remaining visual acuity in his right eye, further limits are not supported.

(ECF No. 7, PageID #: 55). It is clear that the ALJ rejected Walker's statements regarding his right eye because Walker failed to provide any documentation of this new issue after the hearing. *See* SSR 16-3P, 2017 WL 5180304, at *2 ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or

disability."). The ALJ based his decision on the medical evidence that was provided that demonstrated that Walker could see out of his right eye with correction. The ALJ properly did so and explained his reasoning as required by SSR 16-3p.

Additionally, Walker states that he had issues with fatigue and sleepiness during the day and the ALJ did not explain why he rejected these symptoms. At the hearing, Walker stated that when he first started using his CPAP machine "it was really helpful." (ECF No. 7, PageID #: 91). He would wake up early and be "ready to get the day going." (ECF No. 7, PageID #: 91). However, the masks started acting "weird" and he had to change them and had not gotten back into using them. (ECF No. 7, PageID #: 91). He then stated that he had been experiencing issues with fatigue and recently had been taking naps all day. (ECF No. 7, PageID #: 91). The ALJ acknowledged these symptoms (ECF No. 7, PageID #: 51), however, she concluded in a prior section that Walker's obstructive sleep apnea was not severe because "titration polysomnography studies showed optimal control of [it] with use of a CPAP." (ECF No. 7, PageID #: 91). Effective treatment is a reason to reject a claimant's symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(iv)-(v) (instructing the ALJ to consider the effectiveness and side effects of any medications); *Dunn v. Comm'r of Soc. Sec.*, No. 1:15-cv-176, 2016 WL 4194131, at *9–10 (S.D. Ohio July 15, 2016) (considering effective treatment a sufficient reason to discredit the claimant's allegations of pain).

Although the Court acknowledges that the ALJ did not explain her rationale in a single succinct paragraph, the ALJ did explain her decision and support her conclusion in a manner which aided the Court in understanding the reasons the ALJ did not accept the entirety of Walker's subjective complaints. This is sufficient. *See Harper*, 2021 WL 2383833, at *11 ("While the ALJ must discuss significant evidence supporting his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all

the information upon which he relied into a single tidy paragraph."). Accordingly, the Court concludes that the ALJ satisfied SSR 16-3p and Walker's argument is without merit.

## VI.    Recommendation

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

Dated: May 17, 2022

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530–31 (6th Cir. 2019).